## MULLANEY ET AL. v. WILBUR

No. 74–13.   Argued January 15, 1975—Decided June 9, 1975

POWELL, J., delivered the opinion for a unanimous Court.   REHN-QUIST, J., filed a concurring opinion, in which BURGER, C. J., joined, *post,* p. 704.

*Vernon I. Arey,* Assistant Attorney General of Maine, argued the cause for petitioners.   With him on the brief were *Jon A. Lund,* Attorney General, *Richard S. Cohen,* Deputy Attorney General, and *Charles K. Leadbetter,* Assistant Attorney General.

*Peter J. Rubin,* by appointment of the Court, 419 U. S. 1017, argued the cause and filed a brief for respondent.

MR. JUSTICE POWELL delivered the opinion of the Court.

The State of Maine requires a defendant charged with murder to prove that he acted "in the heat of passion on sudden provocation" in order to reduce the homicide to

manslaughter. We must decide whether this rule comports with the due process requirement, as defined in *In re Winship*, 397 U. S. 358, 364 (1970), that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged.

I

In June 1966 a jury found respondent Stillman E. Wilbur, Jr., guilty of murder. The case against him rested on his own pretrial statement and on circumstantial evidence showing that he fatally assaulted Claude Hebert in the latter's hotel room. Respondent's statement, introduced by the prosecution, claimed that he had attacked Hebert in a frenzy provoked by Hebert's homosexual advance. The defense offered no evidence, but argued that the homicide was not unlawful since respondent lacked criminal intent. Alternatively, Wilbur's counsel asserted that at most the homicide was manslaughter rather than murder, since it occurred in the heat of passion provoked by the homosexual assault.

The trial court instructed the jury that Maine law recognizes two kinds of homicide, murder and manslaughter, and that these offenses are not subdivided into different degrees. The common elements of both are that the homicide be unlawful—*i. e.,* neither justifiable nor excusable [1]—and that it be intentional.[2] The prosecution is required to prove these elements by proof beyond a reasonable doubt, and only if they are

---

[1] As examples of justifiable or excusable homicides, the court mentioned a soldier in battle, a policeman in certain circumstances, and an individual acting in self-defense. App. 38.

[2] The court elaborated that an intentional homicide required the jury to find "either that the defendant intended death, or that he intended an act which was calculated and should have been understood by [a] person of reason to be one likely to do great bodily harm and that death resulted." *Id.,* at 37.

so proved is the jury to consider the distinction between murder and manslaughter.

In view of the evidence the trial court drew particular attention to the difference between murder and manslaughter. After reading the statutory definitions of both offenses,[3] the court charged that "malice aforethought is an essential and indispensable element of the crime of murder," App. 40, without which the homicide would be manslaughter. The jury was further instructed, however, that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation.[4] The court emphasized that "malice aforethought

---

[3] The Maine murder statute, Me. Rev. Stat. Ann., Tit. 17, § 2651 (1964), provides:

"Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life."

The manslaughter statute, Me. Rev. Stat. Ann., Tit. 17, § 2551 (1964), in relevant part provides:

"Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice aforethought . . . shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 20 years . . . ."

[4] The trial court also explained the concept of express malice aforethought, which required a "premeditated design to kill" thereby manifesting a "general malignancy and disregard for human life which proceeds from a heart void of social duty and fatally bent on mischief." App. 40–42. Despite this instruction, the court repeatedly made clear that express malice need not be established since malice would be implied unless the defendant proved that he acted in the heat of passion. Hence, the instruction on express malice appears to have been wholly unnecessary, as the Maine Supreme Judicial Court subsequently held. State v. Lafferty, 309 A. 2d 647 (1973). See also n. 10, infra.

and heat of passion on sudden provocation are two inconsistent things," *id.*, at 62; thus, by proving the latter the defendant would negate the former and reduce the homicide from murder to manslaughter. The court then concluded its charge with elaborate definitions of "heat of passion" [5] and "sudden provocation." [6]

After retiring to consider its verdict, the jury twice returned to request further instruction. It first sought reinstruction on the doctrine of implied malice aforethought, and later on the definition of "heat of passion." Shortly after the second reinstruction, the jury found respondent guilty of murder.

Respondent appealed to the Maine Supreme Judicial Court, arguing that he had been denied due process because he was required to negate the element of malice aforethought by proving that he had acted in the heat of passion on sudden provocation. He claimed that under Maine law malice aforethought was an essential element of the crime of murder—indeed that it was the sole element distinguishing murder from manslaughter. Respondent contended, therefore, that this Court's decision in *Winship* requires the prosecution to prove the existence of that element beyond a reasonable doubt.

---

[5] "Heat of passion . . . means that at the time of the act the reason is disturbed or obscured by passion to an extent which might [make] ordinary men of fair, average disposition liable to act irrationally without due deliberation or reflection, and from passion rather than judgment." App. 47.

[6] "[H]eat of passion will not avail unless upon sudden provocation. Sudden means happening without previous notice or with very brief notice; coming unexpectedly, precipitated, or unlooked for. . . . It is not every provocation, it is not every rage of passion that will reduce a killing from murder to manslaughter. The provocation must be of such a character and so close upon the act of killing, that for a moment a person could be—that for a moment the defendant could be considered as not being the master of his own understanding." *Id.*, at 47–48.

The Maine Supreme Judicial Court rejected this contention,[7] holding that in Maine murder and manslaughter are not distinct crimes but, rather, different degrees of the single generic offense of felonious homicide. *State* v. *Wilbur,* 278 A. 2d 139 (1971). The court further stated that for more than a century it repeatedly had held that the prosecution could rest on a presumption of implied malice aforethought and require the defendant to prove that he had acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. With respect to *Winship,* which was decided after respondent's trial,[8] the court noted that it did not anticipate the application of the *Winship* principle to a factor such as the heat of passion on sudden provocation.

Respondent next successfully petitioned for a writ of habeas corpus in Federal District Court. *Wilbur* v. *Robbins,* 349 F. Supp. 149 (Me. 1972). The District Court ruled that under the Maine statutes murder and manslaughter are distinct offenses, not different degrees of a single offense. The court further held that "[m]alice aforethought is made the distinguishing element of the offense of murder, and it is expressly excluded as an element of the offense of manslaughter." *Id.,* at 153. Thus, the District Court concluded, *Winship* requires the prosecution to prove malice aforethought beyond a reasonable doubt; it cannot rely on a presumption of implied malice, which requires the defendant to prove that he acted in the heat of passion on sudden provocation.

---

[7] Respondent did not object to the relevant instructions at trial. The Maine Supreme Judicial Court nevertheless found the issue cognizable on appeal because it had "constitutional implications." *State* v. *Wilbur,* 278 A. 2d 139, 144 (1971).

[8] The Maine court concluded that *Winship* should not be applied retroactively. We subsequently decided, however, that *Winship* should be given complete retroactive effect. *Ivan* v. *City of New York,* 407 U. S. 203 (1972).

The Court of Appeals for the First Circuit affirmed, subscribing in general to the District Court's analysis and construction of Maine law. 473 F. 2d 943 (1973). Although recognizing that "within broad limits a state court must be the one to interpret its own laws," the court nevertheless ruled that "a totally unsupportable construction which leads to an invasion of constitutional due process is a federal matter." *Id.*, at 945. The Court of Appeals equated malice aforethought with "premeditation," *id.*, at 947, and concluded that *Winship* requires the prosecution to prove this fact beyond a reasonable doubt.

Following this decision, the Maine Supreme Judicial Court decided the case of *State* v. *Lafferty*, 309 A. 2d 647 (1973), in which it sharply disputed the First Circuit's view that it was entitled to make an independent determination of Maine law. The Maine court also reaffirmed its earlier opinion that murder and manslaughter are punishment categories of the single offense of felonious homicide. Accordingly, if the prosecution proves a felonious homicide the burden shifts to the defendant to prove that he acted in the heat of passion on sudden provocation in order to receive the lesser penalty prescribed for manslaughter.[9]

In view of the *Lafferty* decision we granted certiorari in this case and remanded to the Court of Appeals for reconsideration. 414 U. S. 1139 (1974). On

[9] The Maine court emphasized that, contrary to the view of the Court of Appeals for the First Circuit, malice aforethought connotes no substantive fact (such as premeditation), but rather is solely a policy presumption. Under its interpretation of state law, the Maine court would require proof of the same element of intent for both murder and manslaughter, the distinction being that in the latter case the intent results from a sudden provocation which leads the defendant to act in the heat of passion. 309 A. 2d, at 670–671 (concurring opinion).

remand, that court again applied *Winship*, this time to the Maine law as construed by the Maine Supreme Judicial Court. 496 F. 2d 1303 (1974). Looking to the "substance" of that law, the court found that the presence or absence of the heat of passion on sudden provocation results in significant differences in the penalties and stigma attaching to conviction. For these reasons the Court of Appeals held that the principles enunciated in *Winship* control, and that to establish murder the prosecution must prove beyond a reasonable doubt that the defendant did not act in the heat of passion on sudden provocation.

Because of the importance of the issues presented, we again granted certiorari. 419 U. S. 823 (1974). We now affirm.

## II

We reject at the outset respondent's position that we follow the analysis of the District Court and the initial opinion of the First Circuit, both of which held that murder and manslaughter are distinct crimes in Maine, and that malice aforethought is a fact essential to the former and absent in the latter. Respondent argues that the Maine Supreme Judicial Court's construction of state law should not be deemed binding on this Court since it marks a radical departure from prior law,[10] leads to in-

---

[10] Respondent relies on *Bouie* v. *City of Columbia*, 378 U. S. 347 (1964). In that case a State Supreme Court's reinterpretation of a criminal statute was so novel as to be "unforeseeable" and therefore deprived the defendants of fair notice of the possible criminality of their acts at the time they were committed. Thus, the retroactive application of the new interpretation was itself a denial of due process. See also *Brinkerhoff-Faris Co.* v. *Hill*, 281 U. S. 673 (1930). In this case, as respondent apparently concedes, Brief for Respondent 12, there was no comparable prejudice to respondent since in Maine the burden of proving heat of passion has rested on the defendant for more than a century. See,

ternally inconsistent results, and is a transparent effort to circumvent *Winship*. This Court, however, repeatedly has held that state courts are the ultimate expositors of state law, see, *e. g., Murdock* v. *City of Memphis,* 20 Wall. 590 (1875); *Winters* v. *New York,* 333 U. S. 507 (1948), and that we are bound by their constructions except in extreme circumstances not present here.[11] Accordingly, we accept as binding the Maine Supreme Judicial Court's construction of state homicide law.

## III

The Maine law of homicide, as it bears on this case, can be stated succinctly: Absent justification or excuse, all intentional or criminally reckless killings are felonious homicides. Felonious homicide is punished as murder— *i. e.,* by life imprisonment—unless the defendant proves

*e. g., State* v. *Knight,* 43 Me. 11, 137–138 (1857). To be sure, the trial court instructed the jury on the concept of express malice aforethought, see n. 4, *supra,* a concept that was subsequently stripped of its vitality by the Maine Supreme Judicial Court. But the trial court explicitly stated that express malice aforethought need not be shown since malice would be implied from the unlawful homicide. In considering these instructions as a whole, see *Cupp* v. *Naughten,* 414 U. S. 141, 147 (1973), we discern no prejudice to respondent.

[11] On rare occasions the Court has re-examined a state-court interpretation of state law when it appears to be an "obvious subterfuge to evade consideration of a federal issue." *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 129 (1945). See *Ward* v. *Love County,* 253 U. S. 17 (1920); *Terre Haute & I. R. Co.* v. *Indiana ex rel. Ketcham,* 194 U. S. 579 (1904). In this case the Maine court's interpretation of state law, even assuming it to be novel, does not frustrate consideration of the due process issue, as the Maine court itself recognized, *State* v. *Wilbur,* 278 A. 2d, at 146, and as the remainder of this opinion makes clear. See generally Comment, Due Process and Supremacy as Foundations for the Adequacy Rule: The Remains of Federalism After *Wilbur* v. *Mullaney,* 26 Me. L. Rev. 37 (1974).

by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter—*i. e.,* by a fine not to exceed $1,000 or by imprisonment not to exceed 20 years. The issue is whether the Maine rule requiring the defendant to prove that he acted in the heat of passion on sudden provocation accords with due process.

### A

Our analysis may be illuminated if this issue is placed in historical context.[12] At early common law only those homicides committed in the enforcement of justice were considered justifiable; all others were deemed unlawful and were punished by death. Gradually, however, the severity of the common-law punishment for homicide abated. Between the 13th and 16th centuries the class of justifiable homicides expanded to include, for example, accidental homicides and those committed in self-defense. Concurrently, the widespread use of capital punishment was ameliorated further by extension of the ecclesiastic jurisdiction. Almost any person able to read was eligible for "benefit of clergy," a procedural device that effected a transfer from the secular to the ecclesiastic jurisdiction. And under ecclesiastic law a person who committed an unlawful homicide was not executed; instead he received a one-year sentence, had his thumb branded and was required to forfeit his goods. At the turn of the 16th century, English rulers, concerned with the accretion of ecclesiastic jurisdiction at the expense of the secular, enacted a series of statutes eliminating the benefit of

---

[12] Much of this history was set out in the Court's opinion in *McGautha* v. *California,* 402 U. S. 183, 197–198 (1971). See also 3 J. Stephen, A History of the Criminal Law of England 1–107 (1883); 2 F. Pollock & F. Maitland, The History of English Law 478–487 (2d ed. 1909).

clergy in all cases of "murder of malice prepensed." [13] Unlawful homicides that were committed without such malice were designated "manslaughter," and their perpetrators remained eligible for the benefit of clergy.

Even after ecclesiastic jurisdiction was eliminated for all secular offenses the distinction between murder and manslaughter persisted. It was said that "manslaughter, when voluntary,[14] arises from the sudden heat of the passions, murder from the wickedness of the heart." 4 W. Blackstone, Commentaries *190. Malice aforethought was designated as the element that distinguished the two crimes, but it was recognized that such malice could be implied by law as well as proved by evidence. Absent proof that an unlawful homicide resulted from "sudden and sufficiently violent provocation," the homicide was "presumed to be malicious." [15] *Id.*, at *201. In view of this presumption, the early English authorities, relying on the case of *The King* v. *Oneby*, 92 Eng. Rep. 465 (K. B. 1727), held that once the prosecution proved that the accused had committed the homicide, it was "incumbent upon the prisoner to make out, to the satisfaction of the court and jury" "all . . . circumstances of justification, excuse, or alleviation." 4 W. Blackstone, Commentaries

---

[13] 12 Hen. 7, c. 7 (1496); 4 Hen. 8, c. 2 (1512); 23 Hen. 8, c. 1, §§ 3, 4 (1531); 1 Edw. 6, c. 12, § 10 (1547).

[14] Blackstone also referred to a class of homicides called involuntary manslaughter. Such homicides were committed by accident in the course of perpetrating another unlawful, although not felonious, act. 4 W. Blackstone, Commentaries *192–193. This offense, with some modification and elaboration, generally has been recognized in this country. See R. Perkins, Criminal Law 70–77 (2d ed. 1969).

[15] Thus it appears that the concept of express malice aforethought was surplusage since if the homicide resulted from sudden provocation it was manslaughter; otherwise it was murder. In this respect, Maine law appears to follow the old common law. See generally Comment, The Constitutionality of the Common Law Presumption of Malice in Maine, 54 B. U. L. Rev. 973, 986–999 (1974).

*201. See M. Foster, Crown Law 255 (1762). Thus, at common law the burden of proving heat of passion on sudden provocation appears to have rested on the defendant.[16]

In this country the concept of malice aforethought took on two distinct meanings: in some jurisdictions it came to signify a substantive element of intent, requiring the prosecution to prove that the defendant intended to kill or to inflict great bodily harm; in other jurisdictions it remained a policy presumption, indicating only that absent proof to the contrary a homicide was presumed not to have occurred in the heat of passion. See *State* v. *Rollins,* 295 A. 2d 914, 918–919 (Me. 1972). See generally Perkins, A Re-Examination of Malice Aforethought, 43 Yale L. J. 537, 548–549, 566–568 (1934).[17] In a landmark case, *Commonwealth* v. *York,* 50 Mass. 93 (1845), Chief Justice Shaw of the Massachusetts Supreme Judicial Court held that the defendant was required to negate malice aforethought by proving by a pre-

---

[16] Fletcher, Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases, 77 Yale L. J. 880, 904–907 (1968), disputes this conclusion, arguing that the reliance on *Oneby's* case was misplaced. In *Oneby* the jury returned a special verdict making specific findings of fact. No finding was made with respect to provocation. Absent such a finding the court held that the homicide was murder. Fletcher maintains that in the context of a special verdict it is impossible to determine whether the defendant failed to satisfy his burden of going forward with "some evidence" or the ultimate burden of persuading the jury. See also n. 20, *infra.*

[17] Several jurisdictions also divided murder into different degrees, typically limiting capital punishment to first-degree murder and requiring the prosecution to prove premeditation and deliberation in order to establish that offense. See Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U. Pa. L. Rev. 759 (1949); Wechsler & Michael, A Rationale of the Law of Homicide: I, 37 Col. L. Rev. 701, 703–707 (1937).

ponderance of the evidence that he acted in the heat of passion.[18]  Initially, *York* was adopted in Maine [19] as well as in several other jurisdictions.[20]  In 1895, however, in

[18] Justice Wilde dissented, arguing that the Commonwealth was required to prove all facts necessary to establish murder, including malice aforethought, which in turn required it to negate the suggestion that the killing occurred in the heat of passion on sudden provocation.  He also rejected the doctrine of implied malice on the ground that "[n]o malice can be inferred from the mere act of killing.  Such a presumption, therefore, is arbitrary and unfounded."  50 Mass., at 128.

[19] *State* v. *Knight,* 43 Me. 11 (1857).

[20] See cases cited in Fletcher, *supra,* n. 16, at 903 nn. 77–79.  Some confusion developed, however, as to precisely what *York* required.  Contemporary writers divide the general notion of "burden of proof" into a burden of *producing* some probative evidence on a particular issue and a burden of *persuading* the factfinder with respect to that issue by a standard such as proof beyond a reasonable doubt or by a fair preponderance of the evidence.  See, *e. g.,* E. Cleary, McCormick on Evidence § 336 (2d ed. 1972).  This distinction apparently was not well recognized at the time *York* was decided, and thus in some jurisdictions it was unclear whether the defendant was required to bear the production burden or the persuasion burden on the issue of heat of passion.  See, *e. g.,* cases discussed in *People* v. *Morrin,* 31 Mich. App. 301, 315–323, 187 N. W. 2d 434, 441–446 (1971).  Indeed, 10 years after the decision in *York,* Chief Justice Shaw explained that "the doctrine of *York's* *case* was that where the killing is proved to have been committed by the defendant, and *nothing further is shown,* the presumption of law is that it was malicious and an act of murder."  *Commonwealth* v. *Hawkins,* 69 Mass. 463, 465 (1855) (emphasis in original).  He further noted that this presumption did not govern when there was evidence indicating that the defendant might have acted in the heat of passion.  In that situation, "if the jury, upon all the circumstances, are satisfied, beyond a reasonable doubt, that [the homicide] was done with malice, they will return a verdict of murder; otherwise, they will find the defendant guilty of manslaughter."  *Id.,* at 466.  Thus, even the author of *York* quickly limited its scope to require only that the accused produce some evidence on the issue of passion; that is, that he satisfy the production but not the persuasion burden.  Other

the context of deciding a question of federal criminal procedure, this Court explicitly considered and unanimously rejected the general approach articulated in *York.* *Davis* v. *United States,* 160 U. S. 469.[21] And, in the past half century, the large majority of States have abandoned *York* and now require the prosecution to prove the absence of the heat of passion on sudden provocation beyond a reasonable doubt. See W. LaFave & A. Scott, Handbook on Criminal Law 539–540 (1972).[22]

This historical review establishes two important points. First, the fact at issue here—the presence or absence of the heat of passion on sudden provocation—has been, almost from the inception of the common law of homicide, the single most important factor in determining the degree of culpability attaching to an unlawful homicide. And, second, the clear trend has been toward requiring the prosecution to bear the ultimate burden of proving this fact. See generally Fletcher, *supra,* n. 16; H. Packer, The Limits of the Criminal Sanction 137–139 (1968).

## B

Petitioners, the warden of the Maine Prison and the State of Maine, argue that despite these considerations

jurisdictions blurred the distinction between these two burdens by requiring the defendant to prove "to the satisfaction of the jury" that he acted in the heat of passion. See, *e. g., State* v. *Willis,* 63 N. C. 26 (1868).

[21] In *Leland* v. *Oregon,* 343 U. S. 790 (1952), the Court declined to apply the specific holding of *Davis*—that the prosecution must prove sanity beyond a reasonable doubt—to the States.

[22] See also *State* v. *Cuevas,* 488 P. 2d 322 (Haw. 1971) (*Winship* requires the prosecution to prove malice aforethought beyond a reasonable doubt). England also now requires the prosecution to negate heat of passion on sudden provocation by proof beyond a reasonable doubt. *Mancini* v. *Director of Public Prosecutions,* [1942] A. C. 1; see *Woolmington* v. *Director of Public Prosecutions,* [1935] A. C. 462.

*Winship* should not be extended to the present case. They note that as a formal matter the absence of the heat of passion on sudden provocation is not a "fact necessary to constitute the *crime*" of felonious homicide in Maine. *In re Winship,* 397 U. S., at 364 (emphasis supplied). This distinction is relevant, according to petitioners, because in *Winship* the facts at issue were essential to establish criminality in the first instance, whereas the fact in question here does not come into play until the jury already has determined that the defendant is guilty and may be punished at least for manslaughter. In this situation, petitioners maintain, the defendant's critical interests in liberty and reputation are no longer of paramount concern since, irrespective of the presence or absence of the heat of passion on sudden provocation, he is likely to lose his liberty and certain to be stigmatized.[23] In short, petitioners would limit *Winship* to those facts which, if not proved, would wholly exonerate the defendant

This analysis fails to recognize that the criminal law of Maine, like that of other jurisdictions, is concerned not only with guilt or innocence in the abstract but also

---

[23] Relying on *Williams* v. *New York,* 337 U. S. 241 (1949), and *McGautha* v. *California,* 402 U. S., at 196, petitioners seek to buttress this contention by arguing that since the presence or absence of the heat of passion on sudden provocation affects only the extent of punishment it should be considered a matter within the traditional discretion of the sentencing body and therefore not subject to rigorous due process demands. But cf. *United States* v. *Tucker,* 404 U. S. 443 (1972). There is no incompatibility between our decision today and the traditional discretion afforded sentencing bodies. Under Maine law the jury is given no discretion as to the sentence to be imposed on one found guilty of felonious homicide. If the defendant is found to be a murderer, a mandatory life sentence results. On the other hand, if the jury finds him guilty only of manslaughter it remains for the trial court in the exercise of *its* discretion to impose a sentence within the *statutorily defined* limits.

with the degree of criminal culpability. Maine has chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor. Because the former are less "blameworth[y]," *State* v. *Lafferty,* 309 A. 2d, at 671, 673 (concurring opinion), they are subject to substantially less severe penalties. By drawing this distinction, while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which it turns, Maine denigrates the interests found critical in *Winship.*

The safeguards of due process are not rendered unavailing simply because a determination may already have been reached that would stigmatize the defendant and that might lead to a significant impairment of personal liberty. The fact remains that the consequences resulting from a verdict of murder, as compared with a verdict of manslaughter, differ significantly. Indeed, when viewed in terms of the potential difference in restrictions of personal liberty attendant to each conviction, the distinction established by Maine between murder and manslaughter may be of greater importance than the difference between guilt or innocence for many lesser crimes.

Moreover, if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law. It would only be necessary to redefine the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment. An extreme example of this approach can be fashioned from the law challenged in this case. Maine divides the single generic offense of felonious homicide into three distinct punishment categories—murder, voluntary manslaughter, and involuntary manslaughter. Only the first two of these categories require that the homicidal act either be

intentional or the result of criminally reckless conduct. See *State* v. *Lafferty, supra,* at 670–672 (concurring opinion). But under Maine law these facts of intent are not general elements of the crime of felonious homicide. See Brief for Petitioners 10 n. 5. Instead, they bear only on the appropriate punishment category. Thus, if petitioners' argument were accepted, Maine could impose a life sentence for any felonious homicide—even one that traditionally might be considered involuntary manslaughter—unless the *defendant* was able to prove that his act was neither intentional nor criminally reckless.[24]

*Winship* is concerned with substance rather than this kind of formalism.[25] The rationale of that case requires an analysis that looks to the "operation and effect of the law as applied and enforced by the State," *St. Louis S. W. R. Co.* v. *Arkansas,* 235 U. S. 350, 362 (1914), and to the interests of both the State and the defendant as affected by the allocation of the burden of proof.

In *Winship* the Court emphasized the societal interests in the reliability of jury verdicts:[26]

"The requirement of proof beyond a reasonable doubt has [a] vital role in our criminal procedure for cogent reasons. The accused during a criminal

---

[24] Many States impose different statutory sentences on different degrees of assault. If *Winship* were limited to a State's definition of the elements of a crime, these States could define all assaults as a single offense and then require the defendant to disprove the elements of aggravation—*e. g.,* intent to kill or intent to rob. But see *State* v. *Ferris,* 249 A. 2d 523 (Me. 1969) (prosecution must prove elements of aggravation in criminal assault case by proof beyond a reasonable doubt).

[25] Indeed, in *Winship* itself the Court invalidated the burden of proof in a juvenile delinquency proceeding even though delinquency was not formally considered a "crime" under state law. 397 U. S., at 365–366; *id.,* at 373–374 (Harlan, J., concurring).

[26] See also *Lego* v. *Twomey,* 404 U. S. 477, 486 (1972).

prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. . . .

"Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." 397 U. S., at 363, 364.

These interests are implicated to a greater degree in this case than they were in *Winship* itself. Petitioner there faced an 18-month sentence, with a maximum possible extension of an additional four and one-half years, *id.*, at 360, whereas respondent here faces a differential in sentencing ranging from a nominal fine to a mandatory life sentence. Both the stigma to the defendant and the community's confidence in the administration of the criminal law are also of greater consequence in this case,[27] since the adjudication of delinquency involved in *Winship* was "benevolent" in intention, seeking to provide "a generously conceived program of compassionate treatment." *Id.*, at 376 (BURGER, C. J., dissenting).

Not only are the interests underlying *Winship* implicated to a greater degree in this case, but in one respect the protection afforded those interests is less here. In *Winship* the ultimate burden of persuasion remained with the prosecution, although the standard had been reduced to proof by a fair preponderance of the evidence.

[27] See *Duncan* v. *Louisiana,* 391 U. S. 145, 160 (1968):

"The penalty authorized by the law of the locality may be taken 'as a gauge of its social and ethical judgments.'" Quoting from *District of Columbia* v. *Clawans,* 300 U. S. 617, 628 (1937).

In this case, by contrast, the State has affirmatively shifted the burden of proof to the defendant. The result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction. Such a result directly contravenes the principle articulated in *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958):

> "[W]here one party has at stake an interest of transcending value—as a criminal defendant his liberty—th[e] margin of error is reduced as to him by the process of placing on the [prosecution] the burden . . . of persuading the factfinder at the conclusion of the trial . . . ."

See also *In re Winship,* 397 U. S., at 370–372 (Harlan, J., concurring).

## C

It has been suggested, *State* v. *Wilbur,* 278 A. 2d, at 145, that because of the difficulties in negating an argument that the homicide was committed in the heat of passion the burden of proving this fact should rest on the defendant. No doubt this is often a heavy burden for the prosecution to satisfy. The same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial. But this is the traditional burden which our system of criminal justice deems essential.

Indeed, the Maine Supreme Judicial Court itself acknowledged that most States require the prosecution to prove the absence of passion beyond a reasonable doubt. *Id.,* at 146.[28] Moreover, the difficulty of meeting such an

---

[28] See *supra,* at 696. See also 38 Mo. L. Rev. 105 (1973). Many States do require the defendant to show that there is "some evidence" indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of

exacting burden is mitigated in Maine where the fact at issue is largely an "objective, rather than a subjective, behavioral criterion." *State* v. *Rollins*, 295 A. 2d, at 920. In this respect, proving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide. And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him. See *Tot* v. *United States*, 319 U. S. 463, 469 (1943); *Leary* v. *United States*, 395 U. S. 6, 45 (1969).

Nor is the requirement of proving a negative unique in our system of criminal jurisprudence.[29] Maine itself requires the prosecution to prove the absence of self-defense beyond a reasonable doubt. See *State* v. *Millett*, 273 A. 2d 504 (1971).[30] Satisfying this burden imposes an obligation that, in all practical effect, is identical to the burden involved in negating the heat of passion on sudden provocation. Thus, we discern no unique hardship on the prosecution that would justify requiring the defendant to carry the burden of proving a fact so critical to criminal culpability.[31]

---

passion beyond a reasonable doubt. See W. LaFave & A. Scott, Criminal Law 539 (1972); Perkins, *supra*, n. 14, at 50–51. See also nn. 16 & 20, *supra*. Nothing in this opinion is intended to affect that requirement. See also n. 30, *infra*.

[29] See generally F. Wharton, A Treatise on the Law of Evidence § 320 (9th ed. 1884); Model Penal Code § 1.13, Comment, p. 110 (Tent. Draft No. 4, 1955); Fletcher, *supra*, n. 16, at 883, and n. 14.

[30] In *Millett* the Maine Supreme Judicial Court adopted the "majority rule" regarding proof of self-defense. The burden of producing "some evidence" on this issue rests with the defendant, but the ultimate burden of persuasion by proof beyond a reasonable doubt remains on the prosecution.

[31] This conclusion is supported by consideration of a related line of

## IV

Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can be given a life sentence when the evidence indicates that it is *as likely as not* that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser

cases. Generally in a criminal case the prosecution bears both the production burden and the persuasion burden. In some instances, however, it is aided by a presumption, see *Davis* v. *United States,* 160 U. S. 469 (1895) (presumption of sanity), or a permissible inference, see *United States* v. *Gainey,* 380 U. S. 63 (1965) (inference of knowledge from presence at an illegal still). These procedural devices require (in the case of a presumption) or permit (in the case of an inference) the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed or inferred fact by having satisfactorily established other facts. Thus, in effect they require the defendant to present some evidence contesting the otherwise presumed or inferred fact. See *Barnes* v. *United States,* 412 U. S. 837, 846 n. 11 (1973). Since they shift the production burden to the defendant, these devices must satisfy certain due process requirements. See *e. g., Barnes* v. *United States, supra; Turner* v. *United States,* 396 U. S. 398 (1970).

In each of these cases, however, the ultimate burden of persuasion by proof beyond a reasonable doubt remained on the prosecution. See, *e. g., Barnes* v. *United States, supra,* at 845 n. 9; *Davis* v. *United States, supra,* at 484–488. Shifting the burden of persuasion to the defendant obviously places an even greater strain upon him since he no longer need only present some evidence with respect to the fact at issue; he must affirmatively establish that fact. Accordingly, the Due Process Clause demands more exacting standards before the State may require a defendant to bear this ultimate burden of persuasion. See generally Ashford & Risinger, Presumptions, Assumptions, and Due Process in Criminal Cases: A Theoretical Overview, 79 Yale L. J. 165 (1969).

crime of manslaughter. *In re Winship*, 397 U. S., at 372 (concurring opinion). We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case. Accordingly, the judgment below is

*Affirmed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, concurring.

While I join in the Court's opinion, the somewhat peculiar posture of the case as it comes to us leads me to add these observations.

Respondent made no objection to the trial court's instruction respecting the burden of proof on the issue of whether he had acted in the heat of passion on sudden provocation. Nonetheless, on his appeal to the Supreme Judicial Court of Maine, that court considered his objection to the charge on its merits and held the charge to be a correct statement of Maine law. It neither made any point of respondent's failure to object to the instruction in the trial court,* nor did it give any consideration to the doctrine long approved by this Court that the

---

*While *Fay* v. *Noia*, 372 U. S. 391 (1963), holds that a failure to appeal through the state-court system from a constitutionally infirm judgment of conviction does not bar subsequent relief in federal habeas corpus, failure to object to a proposed instruction should stand on a different footing. It is one thing to fail to utilize the appeal process to cure a defect which already inheres in a judgment of conviction, but it is quite another to forgo making an objection or exception which might prevent the error from ever occurring. Cf. *Davis* v. *United States*, 411 U. S. 233 (1973). Here, however, the Maine Supreme Judicial Court nevertheless affirmatively ruled that the issue was cognizable despite respondent's failure to object at trial. See majority opinion, *ante*, at 688 n. 7. And the State did not contest the propriety of consideration of the issue in federal habeas.

instructions to the jury are not to be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd* v. *United States,* 271 U. S. 104, 107 (1926); *Cupp* v. *Naughten,* 414 U. S. 141, 147 (1973). It likewise expressed no view on whether, even though the instruction might have amounted to constitutional error, that error could have been harmless. *Chapman* v. *California,* 386 U. S. 18 (1967). Its reason for not treating the possibility that the error was harmless may have been because, as this Court's opinion points out, *ante,* at 687, the jury came back in the midst of its deliberations and requested further instructions on the doctrine of implied malice aforethought and the definition of "heat of passion."

The case which has now reached us through the route of federal habeas corpus, therefore, is a highly unusual one which does present the abstract question of law isolated by the Supreme Judicial Court of Maine and now decided here.

I agree with the Court that *In re Winship,* 397 U. S. 358 (1970), does require that the prosecution prove beyond a reasonable doubt every element which constitutes the crime charged against a defendant. I see no inconsistency between that holding and the holding of *Leland* v. *Oregon,* 343 U. S. 790 (1952). In the latter case this Court held that there was no constitutional requirement that the State shoulder the burden of proving the sanity of the defendant.

The Court noted in *Leland* that the issue of insanity as a defense to a criminal charge was considered by the jury only after it had found that all elements of the offense, including the *mens rea,* if any, required by state law, had been proved beyond a reasonable doubt. *Id.,* at 792, 795. Although as the state court's instructions in *Leland* recognized, *id.,* at 794–795, evidence relevant

to insanity as defined by state law may also be relevant to whether the required *mens rea* was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime. For this reason, Oregon's placement of the burden of proof of insanity on Leland, unlike Maine's redefinition of homicide in the instant case, did not effect an unconstitutional shift in the State's traditional burden of proof beyond a reasonable doubt of all necessary elements of the offense. *Id.,* at 795. Both the Court's opinion and the concurring opinion of Mr. Justice Harlan in *In re Winship, supra,* stress the importance of proof beyond a reasonable doubt in a criminal case as "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." 397 U. S., at 372 (Harlan, J., concurring). Having once met that rigorous burden of proof that, for example, in a case such as this, the defendant not only killed a fellow human being, but did it with malice aforethought, the State could quite consistently with such a constitutional principle conclude that a defendant who sought to establish the defense of insanity, and thereby escape any punishment whatever for a heinous crime, should bear the laboring oar on such an issue.